**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**–BROWNSVILLE DIVISION–**

United States District Court
Southern District of Texas
ENTERED

JAN 2 1 2009

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| CARDINAL HEALTH SOLUTIONS, INC., | § | |
| Plaintiff/Counter-Defendant | § | |
| | § | |
| v. | § | |
| | § | |
| VALLEY BAPTIST MEDICAL CENTER | § | |
| and VALLEY BAPTIST MEDICAL | § | CIVIL ACTION NO. 1:07-CV-111 |
| CENTER–BROWNSVILLE | § | |
| Defendants/Counter-Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | |
| CARDINAL HEALTH 303, INC. | § | |
| Counter-Defendants | § | |

**MEMORANDUM OPINION AND ORDER**

On July 30, 2007, Plaintiff Cardinal Health Solutions, Inc. ("Cardinal Health") filed a

Complaint against Defendants Valley Baptist Medical Center and Valley Baptist Medical

Center–Brownsville (together, "Valley Baptist") alleging breach of contract for amounts due on

account. (Doc. No. 1).  Defendants filed their original Answer and Counterclaim on August 31,

2007, alleging breach of contract by Cardinal Health and requesting declaratory relief.  (Doc. No.

9).  After over a year of extensive discovery, Defendants on September 4, 2008, filed their First

Amended Answer and Counterclaim, adding to their causes of action against Cardinal Health claims

for fraud, breach of fiduciary duty, and alleged violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO").  (Doc. No. 77).  On September 18, 2008, Plaintiff filed a Motion to

Dismiss and/or Motion for Summary Judgment seeking dismissal of Defendants' new counterclaims.

(Doc. No. 90).  Shortly thereafter, Defendants filed a Motion for Partial Summary Judgment

Regarding Fiduciary Duty, asking the Court to find as a matter of law that Cardinal Health owed

Valley Baptist a fiduciary duty. (Doc. No. 110). The Court denied this Motion, and in so doing granted Plaintiff's Motion for Summary Judgment on Defendants' claim for breach of fiduciary duty. (Doc. No. 144).

On October 23, 2008, Defendants filed a Second Amended Answer and Counterclaim, which fleshed out the claims for fraud and the alleged violations of RICO. (Doc. No. 121). Plaintiff then filed a Supplemental Motion to Dismiss and/or Motion for Summary Judgment directed at Defendants' Second Amended Answer and Counterclaim, again seeking dismissal of Defendants' fraud and RICO claims. (Doc. No. 137). On November 21, 2008, this Court held a Hearing at which the parties presented arguments on a variety of pending motions, including Plaintiff's Supplemental Motion. On December 5, 2008, Defendant attempted to file a Response to Plaintiff's Supplemental Motion, however, due to a clerical error, filed the wrong brief. (Doc. No. 159). This Court granted Defendants leave to file the proper Response brief, which they did on December 15, 2008. (Doc. No. 168). In the meantime, Plaintiff had already filed its Reply brief in support of its Supplemental Motion. (Doc. No. 165). On December 22, 2008, Defendants filed a set of Objections to Plaintiff's Reply, contending that Plaintiff had in its Reply brief asserted additional grounds and evidence for summary judgment in violation of the Federal Rules of Civil Procedure, as well as this Court's own Civil Procedures. (Doc. No. 177).

Having considered Plaintiff's Supplemental Motion to Dismiss and/or Motion for Summary Judgment (Doc. No. 137), Defendants' corrected Response in Opposition to Plaintiff's Supplemental Motion (Doc. No. 168), Plaintiff's Reply (Doc. No. 136), Defendants' Objections (Doc. No. 177), the parties' exhibits and all other relevant evidence, and the arguments at the Hearing of November 21, 2008, Plaintiff's Supplemental Motion to Dismiss and/or Motion for Summary Judgment (Doc.

No. 137) is **GRANTED IN PART** and **DENIED IN PART**.[1]  Specifically, the Court **GRANTS**

Plaintiff summary judgment on Defendants' fraudulent-inducement and fraudulent-nondisclosure

claims, and **GRANTS** Plaintiff summary judgment on Defendants' RICO claims in their entirety.

The Court **DENIES** Plaintiff summary judgment on Defendants' claim of fraudulent

misrepresentation related to invoices issued during the life of the contracts.

## BACKGROUND[2]

Plaintiff's predecessor-in-interest, Cardinal Health 109, Inc., entered into separate written

contracts, known as "Pharmacy Agreements," with Defendants Valley Baptist Medical Center and

Valley Baptist Medical Center–Brownsville in 2003 and 2005, respectively.  Under these

agreements, Cardinal Health operated and managed all aspects of Defendants' pharmacy care

services at their respective hospitals.  These services included purchasing, dispensing, and

administering drugs and biologicals to Defendants' patients, staffing pharmacy units, and a range of

other services.  At some point in late 2006, a dispute arose between the parties regarding the sums

due under the terms and conditions of the Pharmacy Agreements, and Defendants began withholding

payments to Plaintiff.  Cardinal Health filed the instant suit on July 30, 2007, alleging breach of

contract and requesting specific performance of the defendants in the form of payment to Cardinal

Health of all monies allegedly owed.  Thus began the procedural history outlined above.

---

[1] The Court while reviewing the arguments made in Plaintiff's Supplemental Motion did not rely on any new grounds or evidence attached to Plaintiff's Reply, or anywhere else, to reach the conclusions contained herein.  Thus, Defendants' Objections to same (Doc. No. 277) are **DENIED** as moot.

[2] The following factual summary is taken from Plaintiff's Original Complaint (Doc. No. 1), Defendants' Motion for Partial Summary Judgment (Doc. No. 68), and Plaintiff's Response to Defendants' Motion for Partial Summary Judgment Regarding Fiduciary Duty (Doc No. 119), as these documents taken together provide a reasonably balanced and informative narrative.  These factual recitations are not necessarily supported by summary-judgment evidence and thus are not intended to be considered as factual findings, but merely as informative background.

## STANDARDS

Cardinal Health has styled the motion now under review as its "Motion to Dismiss and/or Motion for Summary Judgment." (Doc. No. 137).  Plaintiff urges dismissal of Defendants' fraud and RICO claims under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  (*Id.* at 7, 13–14).  Rule 9(b) requires that "circumstances constituting fraud . . . shall be stated with particularity."  FED. R. CIV. PROC. 9(b).  This Court has already ruled that Defendants have stated their fraud claims with particularity sufficient to satisfy Rule 9(b).  (*See* Transcript of Hearing of November 21, 2008).  To the extent that the predicate acts supporting Defendants' RICO claim are these same fraud allegations, (see Doc. No. 121 at 29–30), the Court finds that the RICO claim also satisfies Rule 9(b).  Thus, Plaintiff's Motion to Dismiss rests solely on Rule 12(b)(6), failure to state a claim on which relief can be granted.  The Court will address Plaintiff's 12(b)(6) arguments in the process of discussing the broader summary-judgment issues.

## I.     Standard Under Rule 12(b(6)

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept all factual allegations as true and must review them in the light most favorable to the Plaintiff, drawing all reasonable inferences in favor of the pleader.  *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996).  To avoid dismissal for failure to state a claim, a plaintiff must plead specific conduct and actions giving rise to a constitutional violation.  *Baker*, 75 F.3d at 195.  Conclusory allegations and unwarranted deductions of fact are not admitted as true in a motion to dismiss.  *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) (citing *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).  To decide whether a complaint sufficiently states any claims against the defendants, a court must look to the facts well pleaded by the complaint.  *Id.*  A Rule 12(b)(6) dismissal may not

be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).

## II.     Summary Judgment Standard

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must go beyond the pleadings and provide specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e)(2); *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322–23.

## Discussion

### I.     Fraud Claims

For the purposes of this discussion, the Court will divide Defendants' various fraud claims into three categories: (1) fraudulent inducement[3]; (2) fraudulent misrepresentation; and (3) fraudulent nondisclosure.  We address each category in turn.

### A.    *Fraudulent inducement*

Under Texas law, a plaintiff establishes a fraudulent inducement claim by showing the elements of a simple fraud claim.  *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 480 (5th Cir. 2000).  These elements are: (1) a material representation (2) that was false, and (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of its truth as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.  *Lane v. Halliburten*, 529 F.3d 548, 564 (5th Cir. 2008) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).  Further, a promise of future performance constitutes actionable fraud only if "the promise was made with no intention of performing at the time it was made."  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

---

[3]Defendants in their Second Amended Answer and Counterclaim use the phrase "fraudulently induced" when describing the instances of fraud the Court will include in this category.  (Doc. No. 121 at 20, 21).  In their Response to Plaintiff's Supplemental Motion, however, Defendants, while still using this language, characterize these instances for the first time as "fraudulent misrepresentation." (Doc. No. 168 at 14, 26, 32).  Since in Texas a plaintiff establishes fraudulent inducement by showing the elements of a simple fraud claim, which includes fraudulent misrepresentation, see *infra*, the Court will in the interest of clarity categorize these claims as fraudulent inducement and categorize as fraudulent misrepresentation only those claims of fraud concerning individual invoices submitted to Defendants during the life of the Pharmacy Agreements.

Defendants assert three separate fraudulent inducement claims against Cardinal Health. Defendants contend first that Cardinal Health[4] fraudulently induced Defendants into signing the Pharmacy Agreements by promising that it would provide Defendants with "all contracts, books, documents and records that are necessary to certify to the nature and extent of the costs hereunder for a period of four (4) years after furnishing the services hereunder." (Doc. No. 121 at 20 (quoting Pharmacy Agreements at Article V, section 5.08)). Nonetheless, Defendants contend, Cardinal Health "knew at the time it made this representation that it would not provide all such necessary books, documents and records as promised and that it would instead take the position that certain of the contracts, books, documents and/or records necessary for [Defendants] to certify the nature and extent of the costs sought by [Cardinal Health] would later be claimed to be somehow confidential or proprietary to [Cardinal Health], or to have been 'lost.'" *Id.*

Second, Defendants contend that Cardinal Health fraudulently induced Valley Baptist Medical Center ("VBMC") into signing the Pharmacy Agreement in September 2003 by representing in an assessment of VBMC's pharmacy operation that

> [B]y applying proprietary automation technology, proven drug protocols and personnel management, we will control the cost of operating VBMC's pharmacy and drug spending, while also addressing operational inefficiencies that impede ideal pharmacy performance. Over the next 5 years, this partnership should yield VBMC approximately $42.5 million.

(Doc. No. 121 at 21). Defendants allege that Cardinal Health knew at the time it made this representation that it was false (or recklessly asserted it without knowledge) "because Cardinal

---

[4]When describing their allegations, Defendants identify predecessors-in-interest to Plaintiff Cardinal Health Solutions, Inc., e.g., Cardinal Health 101, Inc. and Cardinal Health 109, Inc., as the entities actually responsible for the allegedly fraudulent activity. For ease of reference, the Court will refer to these various entities under the rubric of the name "Cardinal Health," although the Court does not thereby express any judgment concerning the extent to which Plaintiff Cardinal Health Solutions, Inc. has in fact assumed from these predecessor entities any particular set of liabilities.

Health systematically and routinely overcharges and makes false, baseless charges to its partner hospitals," as well as fails to provide the books, documents, and records necessary for its partner hospitals to certify these charges. (*Id.* at 21–22).

Third, Defendants contend that Cardinal Health fraudulently induced VBMC into signing the Pharmacy Agreement by representing in this same assessment of VBMC's pharmacy operation that "Cardinal Healathwill [sic] employ proven utilization protocols and enhanced pharmacy production to drive pharmaceutical costs 4% below the current trend line of 10%. This reduction will increase exponentially in years 2–5." (*Id.* at 21). Again, Defendants allege Cardinal Health knew at the time it made this representation that it was false (or recklessly asserted it without knowledge) "because Cardinal Health systematically and routinely overcharges and makes false, baseless charges to its partner hospitals," as well as fails to provide the books, documents, and records necessary for its partner hospitals to certify these charges.

## 1.     All contracts, books, documents, and records necessary to certify costs

Defendants' first allegation of fraudulent inducement concerns Article V, Section 5.08 of the Pharmacy Agreements, which provides in pertinent part that "Cardinal Health hereby agrees to make available to . . . Health Care Facility [i.e., Defendants] and intermediary or their authorized representatives, all contracts, books, documents and records that are necessary to certify to the nature and extent of the costs hereunder for a period of four (4) years after furnishing of services hereunder." Defendants allege that the inclusion of this provision in the Pharmacy Agreements reflected one of several concerns "important to VBMC and VBMC–Brownsville in making the decision to sign the Pharmacy Agreement." (Declaration of James Eastham, at ¶4). Further, "the early drafts of the Pharmacy Agreement presented by Cardinal Health did not include the

8

requirement in Section 5.08 that Cardinal Health provide to VMBC 'all contracts, books, documents and records that are necessary to certify to the nature and extent of the costs hereunder . . . .' VBMC requested that Cardinal Health include this specific requirement in the Pharmacy Agreement, and Cardinal Health did so." (Declaration of Jim Wesson, at ¶3).

The Court finds that this evidence is sufficient for summary judgment to raise a fact issue that Cardinal Health made a pre-contractual material representation to Defendants concerning provision of necessary documents to certify future costs incurred during the course of the parties' business relationship, which representation was then memorialized in the Pharmacy Agreements at Section 5.08. Thus, we need not consider Plaintiff's contention that the representation, as a purely contractual provision, implicates the economic loss rule.[5] (Doc. No. 165 at 32).

The second element of a fraudulent inducement claim requires that the material representation in question be false. On this particular claim, the issue is whether Cardinal Health in fact provided the hospitals with the contracts, books, documents, and records necessary to certify Cardinal Health's charges. Answering this question turns, as will be seen below in more detail, on what contracts, books, documents, and records are determined necessary to "certify the nature and extent of the costs" Cardinal Health charges its clients. Suffice it to say that both sides have joined issue on this element: Plaintiff claims (with factual support) that it supplied all necessary documents,

---

[5] Under the "economic loss rule," or, as it is also known, the "independent injury doctrine," "a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim." *Sterling Chems., Inc. v. Texaco, Inc.*, 259 S.W.3d 793, 795 (Tex.App.–Houston [1st Dist.] 2007, pet. denied). Nonetheless, the Supreme Court of Texas has held that there *does* exist "a legal duty not to fraudulently procure a contract . . . separate and independent from the duties established by the contract itself." *Formosa Plastics Corp. v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). Further, "[u]nder Texas law, 'tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract.'" *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 729–30 (5th Cir. 2003) (quoting *Formosa Plastics*, 960 S.W.2d at 47). The Court will have occasion to discuss further and apply this doctrine in the context of Defendants' fraudulent misrepresentation claim.

while Defendants claim (with factual/expert support) that not all necessary documents were supplied. Since the Court will dispose of this particular inducement claim by denying that Defendants have provided evidence sufficient for summary judgment on the issue of whether Cardinal Health knew this representation was false when it made it, discussed next, the Court declines at this time to discuss further the second element.

The third element of a fraudulent inducement claim is whether at the time when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of its truth as a positive assertion. A material representation constituting a promise of future performance is actionable "if the promise was made with no intention of performing at the time it was made." *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992). However, the mere failure to perform a contract is not evidence of fraud. *See id.* Rather, Defendants must present evidence that Cardinal Health made this representation "with no intention of performing as represented." *Formosa Plastics Corp. v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). Moreover, "the evidence presented must be relevant to [Cardinal Health's] intent at the time the representation was made." *Id.*

Thus, when a fraudulent inducement claim rests upon a representation constituting a promise of *future* performance, the third element asks: was the promise made with no intention at that time of performing as represented? The Court must therefore determine whether Defendants have offered summary-judgment evidence sufficient to show that when Cardinal Health represented to Defendants that it would provide the hospitals with "all contracts, books, documents and records that are necessary to certify to the nature and extent of the costs" of its pharmacy services, Cardinal Health made this promise with no intention at that time of performing as represented.

10

When evaluating the sufficiency/existence of Defendants' evidence regarding Cardinal Health's intent, the Court is guided by several considerations. "Since intent to defraud is generally not susceptible to direct proof, it usually must be proven by circumstantial evidence. 'While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation was made.'" *Coffel v. Stryker Corp.*, 284 F.3d 625, 634 (5th Cir. 2002) (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). "Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made. However, that fact is a circumstance to be considered with other facts to establish intent." *Spoljaric*, 708 S.W.2d at 435 (citing cases). Nevertheless, "[s]light circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id.* at 435 (internal quotation marks omitted). Moreover, "'intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of witnesses and the weight to be given their testimony[.]'" *Beijing Metals & Minerals Import/Export Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1185 (5th Cir. 1993) (quoting *Spoljaric*, 708 S.W.2d at 434).

Defendants offer a number of items intended to support their contention that circumstantial evidence shows Cardinal Health never intended to fulfill its promise to provide necessary records when it made this promise during contract negotiations with the hospitals. Defendants first cite an intra-office email from Will Clark, Business Director for Cardinal Health, dated May 18, 2006, regarding Valley Baptist's request for "billing support information." Defendants contend in their Response that in this email, Clark "acknowledged Cardinal Health's policy of withholding certain supporting documents (which were critical for any meaningful audit of Cardinal Health invoices)."

11

(Doc. No. 168 at 17). Defendants cite as the offending language: "Of course there are certain items which we have held, and will continue to hold, as confidential. Our purchases and the Diagnosis Rx translator table are the principal examples." (*Id.*). These items are "necessary," Defendants contend, because "[w]ithout knowledge of all of the purchase data and other data at the 'drug detail' level (e.g., inpatient and outpatient fee detail), it is impossible to know how the drugs were priced or how to apply the Pharmacy Agreements to purchase and sale of the drugs for which Cardinal Health charged and invoiced Defendants." *Id.* at 17–18 (citing Declaration of Betty Ganey, at ¶¶8–13)).

In another internal Cardinal Health email, dated August 3, 2006, Will Clark proposes responding to a request from Valley Baptist "for the pdf reports in an excel or dbf format" by referencing Cardinal Health's policy that it considers the requested data "Cardinal's proprietary information as this represents the data stream we use to manage the Hospital's pharmacy." Such a policy, Defendants contend, "is evidence that Cardinal Health knew its promise to provide all necessary books, records and documents was false at the time it was made." (Doc. No. 168 at 18). Indeed, Defendants allege that Cardinal Health sought to discourage Valley Baptist's requests by claiming that "[d]ue to the Hospital's time and resource constraints, it is not feasible or practical for the Hospital to recreate the total drug fees billed by Cardinal Health." (Email of August 3, 2006, from Will Clark to Andy Rodriguez). Defendants also cite an internal email from Will Clark in which he states, "Well, once again the hospital . . . is asking for the drug fee details in a manipulative format. For obvious reasons, I would prefer not to give this to them now." (Email of August 1, 2006, from Will Clark to Jim Merritt).

Regarding the email of May 18, 2006, the Court suggests that reproducing a larger section of the email creates a more meaningful context for evaluating the import of the portion Defendants quote:

> As you will see from the attached reports, **we have provided all of the details to support the fees we charge**. Furthermore, this information has been provided since the inception of the contract. **Using this information, the hospital is able to support the payments they make to us and audit our billing practices**. . . . . Of course there are certain items which we have held, and will continue to hold, as confidential. Our purchases and the Diagnosis Rx translator table are the principal examples. . . . . Based on the deal type we have, our fees are driven by the hospital's utilization. As they provide the utilization to us, they are the keepers of the source data. **They can tie our utilization-based fees back to the original source data they provided**. . . . . In any event, we will continue to provide the attached detailed billing support data and allow or create access for any piece of information which is reasonably required for the hospital's auditing needs. Does this mean we will provide our purchases in an 80/20 format? No. However, **we will certainly provide a sampling of our drug invoices so that our cost basis can be audited. Again, we will provide any and all information needed for the client to audit and make a reasonable, best effort to verify our bill**. We will not provide any and all information needed for the client to replicate our proprietary processes and systems. Based on our conversations I have had with the client, this entire issue boils down to the previous two statements: their need to audit versus our need to preserve Cardinal Health's assets.

(emphasis added). The highlighted portions of this email clearly indicate that as of May 18, 2006, Cardinal Health's Business Manager believed (or represented to other Cardinal Health managers in a wholly internal email that he believed) that the records Cardinal Health was willing to provide were "reasonably required to meet the hospital's auditing needs," a phrase the Court finds sufficiently equivalent to "certify[ing] the extent and nature of the costs" Cardinal Health had been charging the Hospitals.

Defendants contend, however, that regardless of Mr. Clark's assertion of Cardinal Health's willingness to provide all the records reasonably required for Defendants' auditing needs, to the

extent that he also insists that Cardinal Health will withhold certain items as confidential, including

any information needed "for the client to replicate our proprietary processes and systems," Mr. Clark

betrays Cardinal Health's apparent long-standing intention never to provide the hospitals with the

necessary records for a proper audit.  This is because, according to the Declaration of Defendants'

expert Betty Ganey:

> In the pharmacy management industry, without knowledge of the data at the 'drug
> detail' level, it is impossible to evaluate how the drugs were priced or how to apply
> a pharmacy agreement . . . to the purchase and sale of any of these drugs.  Moreover,
> in order for Cardinal Health to create an invoice to bill VBMC per the Pharmacy
> Agreement, it would have been necessary for Cardinal Health to have in an
> electronic[ly] searchable database the drug detail data on the majority of the drugs
> purchased by Cardinal Health or dispensed by Cardinal Health to VBMC. . . . .
> Without the drug detail information, neither my company nor any other person can
> determine whether the charges that Cardinal Health has sought against VBMC were
> correct. . . . .  In addition, the data on the majority of these drugs must be contained
> in an electronically searchable format (such as Microsoft Excel) in order for such
> information or data to be usable. . . . .  It is either impossible or exorbinately
> expensive to make these calculations or audit Cardinal Health's charges without the
> data being contained in an electronically searchable format.

(Declaration of Betty Ganey, at ¶¶7–10).  The term "drug detail", according to Ms. Ganey, includes:

the name of the drugs, the strength of the drugs, the quantity of the drugs, the amount that Cardinal

Health paid for the drugs, the amount Cardinal Health charged the hospitals in terms of calculation

of the "pharmaceutical fee," and the unique NDC number for the drugs given to each specific drug

pursuant to federal law.  (*Id.*, at ¶6).

    Taken together, the preceding evidence suggests at most that: (1) Mr. Clark refused on May

6, 2006, to provide the hospitals with "certain items which we have held, and will continue to hold,

as confidential . . . [o]ur purchases and the Diagnosis Rx translator table [being] the principal

examples," as well as provision of purchases in an 80/20 format (or an Excel, dbf, or other

14

"manipulative" format, see email of August 1, 2006), or any other information needed for the client to replicate Cardinal Health's proprietary processes and systems; (2) Mr. Clark believed that these records and formats were not reasonably required for the hospitals' auditing needs; and (3) Defendants' expert believes that without the drug detail information, which includes the name of the drugs, the strength of the drugs, the quantity of the drugs, the amount that Cardinal Health paid for the drugs, the amount Cardinal Health charged the hospitals in terms of calculation of the "pharmaceutical fee," and the unique NDC number for the drugs given to each specific drug pursuant to federal law, neither her company nor any other person can determine whether the charges that Cardinal Health has sought against VBMC were correct.[6]

The Court finds that this evidence, taken together, does not constitute either direct or circumstantial evidence that when Cardinal Health represented to Defendants prior to the entry into the contract that it would provide the Hospitals with "all contracts, books, documents and records that are necessary to certify to the nature and extent of the costs" of providing its pharmacy services, Cardinal Health made this promise "with no intention of performing as represented at the time the

---

[6]Defendants also cite testimony from the deposition of Steve Adams, President of Pharmacy Services at Cardinal Health Resources, L.L.C., in which Mr. Adams testifies that purchase data would "generally" be necessary to audit Cardinal Health's invoices. (Doc. No. 168 at 18 (citing Deposition of Steve Adams at 187–188)). Defendants describe this as an "admission," however, the context suggests otherwise. Defense counsel begins this line of questioning by noting that "one way of looking at the Harlingen hospital contract with Valley Baptist [sic–Adams presumably means contract with *Cardinal Health*] is billing based on utilization." Mr. Adams agrees, and defense counsel then distinguishes these types of contracts from "a different model based on purchases." Mr. Adams describes this alternative model as one "based on cost, which is closely–more closely aligned to the purchase activity." At this point, defense counsel poses a hypothetical: "If you are billing–Cardinal is billing the hospital based on costs or purchases . . . would it be necessary for the entity to audit the Cardinal billing and would it be necessary for them to obtain the purchase data to audit the bills at that point on a cost or purchases model?" It was to this hypothetical question, assuming a different type of contract from the Pharmacy Agreements, i.e. assuming a "costs" or "purchase" model, rather than a "utilization" or "dispensing" model, to which Mr. Adams then replies, "I don't–I don't know for sure if they were going to audit the bill in a cost plus arrangement would [sic] it be necessary to get the invoices. I'd say generally speaking, yes." Indeed, when asked if a hospital operating under a cost or purchases model were to request such purchase data, "if it was necessary for them to audit it, I assume in general Cardinal would comply and produce it?" Mr. Adams replies, "I'd say generally, yes." To the extent that this answer concerns a hypothetical question on a type of contract different from the Pharmacy Agreements, it is not relevant to this case.

15

promise was made." To find otherwise, this Court must find it reasonable for a jury to conclude that because Defendants' expert believes that certain types of data and formatting are necessary to certify Cardinal Health's charges, Cardinal Health more likely than not had no intention of providing information it believed would be necessary to certify its charges under the type of contract being negotiated (i.e., a "utilization" or "dispensing" contract, see *infra* footnote 5). The Court finds that a reasonable jury could not so conclude.

The very evidence Defendants cite includes repeated statements by the Cardinal Health Business Manager in internal emails that he believed Cardinal Health was providing the hospitals with all the data reasonably necessary to conduct an audit. Mr. Clark may have, in fact, been mistaken, but that is not the issue. These emails show that a disagreement existed between Cardinal Health and Valley Baptist concerning whether provision of certain kinds of data, and, more particularly, provision in certain manipulable formats, is necessary to the hospitals' auditing needs. Mr. Clark insists that this data and these formats are not necessary, and he seeks to withhold them because they apparently constitute the "value-added" Cardinal Health brings to its clients as a pharmacy-management service provider.[7] Defendants' expert may disagree, but this belief is no evidence of Cardinal Health's beliefs or intentions at the time in question.

---

[7]In the email of August 1, 2006, Mr. Clark makes this concern explicit:

The attached data stems from a hospital request made 3 years ago. In essence, it is our response to the hospital's need to audit our quarterly, or final, drug fees within the dxrx billing model. This PDF file has been provided for every contract quarter since the beginning of the agreement. . . . .[The Hospital has] asked for the same PDF file in an excel or Access format so they can maniuplate [sic] the data for their own needs. As this did not and does not fit within the boundaries of an audit process and it would lead to jeopardizing our agreement, we have held firm on not providing the data in a manipulative format. Well, once again the hospital . . . is asking for the drug fee details in a manipulative format. For obvious reasons, I would prefer not to give this to them now.

For these reasons, the Court finds that Defendants have failed to provide summary-judgment evidence sufficient to raise a fact issue that Cardinal Health had no intention of performing as represented when it promised to provide "all contracts, books, documents and records that are necessary to certify to the nature and extent of the costs" of providing its pharmacy services, and so Defendants fail to meet a necessary element of a fraudulent inducement claim based on this promise. Accordingly, Plaintiff's Motion for Summary Judgment on this claim is GRANTED.

## 2.      Control costs and yield $42.5 million in savings

Defendants' second allegation of fraudulent inducement concerns a "Written Assessment"[8] of VBMC's pharmacy operation submitted by Cardinal Health to Valley Baptist on or about July 23, 2003, which at one point apparently[9] states that

> [B]y applying proprietary automation technology, proven drug protocols and personnel management, we will control the cost of operating VBMC's pharmacy and drug spending, while also addressing operational inefficiencies that impede ideal pharmacy performance.  Over the next 5 years, this partnership should yield VBMC approximately $42.5 million.

(Doc. No. 121 at 21).  Defendants allege that Cardinal Health failed to control VBMC's pharmacy and drug spending costs because it "grossly overcharged VBMC."  (Doc. No. 168 at 27).  Further, "VBMC never realized any portion of the $42.5 million in savings Cardinal Health claimed it would bring to VBMC."  (*Id.*).  Indeed, "the rate of VBMC's costs increases actually escalated under Cardinal Health's management."  (*Id.*).

---

[8] The Court uses this term to describe the document filed as "Exhibit A" with Defendants' Response to Plaintiff's Original Motion to Dismiss and/or Motion for Summary Judgment, (Doc. No. 126), which begins: "Cardinal Health conducted a Pharmacy Assessment on June 23–25, 2003."

[9] The Court has been unable to find this language in "Exhibit A" to Doc. No. 126, the exhibit cited by Defendants in both of their Response Motions.  As Plaintiff has discussed this claim in its briefs without objecting to the quoted language, and as the Court grants Plaintiff summary judgment on the claim in any case, this confusion is immaterial for the purposes of this Order.

For purposes of this Motion, the Court finds that these were material representations, and so the first element of a fraud claim is met.[10]

As with Defendants' first claim of fraudulent inducement, the Court declines at this time to decide the second element, i.e., whether the material representation was false, and moves directly to consideration of the third element.

To the extent that the instant claim, like the preceding one, rests on a promise of future performance, it is actionable only "if the promise was made with no intention of performing at the time it was made." *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992).  Thus, the third element of this fraudulent-inducement claim asks: was the promise made with no intention at that time of performing as represented?  Accordingly, the Court must determine whether Defendants have offered summary-judgment evidence sufficient to show that when Cardinal Health represented to Defendant VMBC that by applying various technologies, protocols, and personnel management, it would "control the costs of operating VBMC's pharmacy and drug spending," while also addressing operational inefficiencies, and that the partnership "should yield VBMC approximately $42.5 million," Cardinal Health made this promise with no intention at that time of performing as represented.

Defendants contend that Cardinal Health had no intention of performing as represented "because of its illegal billing practices" and its "systematic pattern and practice of overcharging health care institutions." (Doc. No. 168 at 28).  Further, "the nature and extent of these overcharges are such that they can only be intentional, and not accidental or random errors." (*Id.*).  Defendants

---

[10]The Court chooses not to address the potential issue of whether the representation that the partnership "should yield" savings of $42.5 million is indeed a representation that it "*would*" yield such savings.

18

also contend that Cardinal Health's refusal to provide the necessary books, documents, and records

to certify its cost charges, and its discouragement of requests for such information, indicate that it

never had any intention of controlling costs or saving $42.5 million.  (*Id.* at 29).  Finally, Cardinal

Health never intended to perform because its internal policy was to obtain a 20% profit margin on

its contracts, and "[s]uch a high profit margin simply would not permit the kinds of savings . . . that

Cardinal Health promised, or any savings for that matter."  (*Id.*).

We begin with Defendants' first contention, that Cardinal Health had no intention of

performing as represented because of its alleged illegal billing practices and alleged systematic

pattern and practice of overcharging health care institutions.  In support, Defendants cite the

Declaration of Betty Ganey, paragraphs 16 and 17.  These portions state in relevant part:

> In my work with other institutions that had used Cardinal Health to provide
> pharmacy management services, I have seen a systematic pattern and practice of
> overcharging on the part of Cardinal Health, including charging for a greater quantity
> than the amount actually dispensed by Cardinal Health.  In particular, in my work
> with Community Medical Center in Missoula, Montana, and with Bon Secours St.
> Joseph Hospital in Port Charlotte, Florida, which work with both institutions
> continues on the audit of Cardinal Health invoices, the fraudulent overcharges in each
> case total at this time into at least the hundreds of thousands of dollars if not greater.
> As evidence of Cardinal Health's systematic improper billing practices, while
> I was working with Community Medical Center in Missoula, Montana, I was told by
> a corporate compliance officer of Cardinal Health that Cardinal Health's practice is
> to dispense and charge multiple times from a "single-use" only drug vial. . . . This
> improper practice . . . would partially explain how Cardinal Health could charge
> VBMC for dispensing more drugs than Cardinal Health actually purchased.

This evidence reduces to the following: Defendants' expert has seen at other facilities what she

describes as a "systematic pattern and practice of overcharging on the part of Cardinal Health,"

including charging higher prices than contractually permissible, charging for drugs that were never

dispensed, and improperly dispensing and charging multiple times from "single-use" vials.  Such

19

practices allegedly resulted in overcharges totaling "at least into the hundreds of thousands of dollars" in at least two cases.

The question for the Court, then, is this: assuming that Cardinal Health does have such a practice of overcharging, as claimed by Ms. Ganey, and assuming that the Cardinal Health employees or agents who prepared the Written Assessment knew of this alleged practice, could a reasonable jury conclude from this that Cardinal Health could have had no intention of using various technologies and processes to control costs, thereby saving Defendants up to $42.5 million from a partnership with the hospital? The Court finds that a reasonable jury could not so conclude. It is entirely possible that Cardinal Health systematically overcharges its clients, as claimed by Ms. Ganey, but at the same time uses various technologies and processes to control a whole range of costs, yielding in the process savings for the hospital of up to $42.5 million–savings the hospital would not otherwise have enjoyed. Whether such a practice actually took place or is proper is not the point. The plausibility of such a practice, however, indicates that the alleged fact of systematic overcharging at other institutions does not necessarily indicate anything about Cardinal Health's intention of fulfilling the promise it made in the Written Assessment at the time of the writing, and so does not constitute circumstantial evidence regarding that intent.[11]

Defendants' second contention, that the nature and extent of Cardinal Health's alleged overcharges are such that they can only be intentional, and not accidental or random errors, may well be true, but even assuming the overcharges in question, it is irrelevant. Again, such overcharges indicate nothing about Cardinal Health's intention at the time to use various technologies and

---

[11] It is important to note that in the material provided to the Court, there are no dates connecting any such intent to the time of the representations. For example, there are no dates attached to Ms. Ganey's experience with other institutions or to the allegedly similar (mis)representations made to them by Cardinal Health.

processes to control costs and to yield up to $42.5 million from the partnership. Cardinal Health could have overcharged as often and to the extent Defendants allege, and still have fully intended to control costs and yield savings in the manner described.

Defendants' third contention attempts to infer Cardinal Health's intent concerning cost savings from its alleged refusal to provide necessary documents. Defendants state that Cardinal Health's refusal to provide various data is evidence that "Cardinal Health knew this promise [concerning cost savings] was false at the time it was made." This is simply a *non sequitur*. Even if we assume that Cardinal Health did refuse to provide data it knew was necessary for proper auditing, this is not incompatible with its using various technologies and processes to control costs and to yield up to $42.5 million in savings from the partnership. There are a whole host of reasons, for good or for ill, why Cardinal Health might not provide such documents, any number of which have no relationship whatsoever to using technologies to control costs or generating savings.

As to the last contention, Defendants provide no evidence whatsoever that a 20% profit margin on contracts like the Pharmacy Agreements is incompatible with savings in any amount. Accordingly, the Court gives it no weight.

For these reasons, the Court finds that Defendants have failed to provide summary-judgment evidence sufficient to show that Cardinal Health had no intention of performing as represented when it promised to Defendant VMBC that by applying various technologies, protocols, and personnel management, it would "control the costs of operating VBMC's pharmacy and drug spending," while also addressing operational inefficiencies, and that the partnership "should yield VBMC approximately $42.5 million." Thus, Defendants fail to meet a necessary element of a fraudulent-

inducement claim based on this promise, and Plaintiff's Motion for Summary Judgment on this claim is GRANTED.

### 3.    Reduce costs exponentially

Defendants' third allegation of fraudulent inducement also concerns a statement from the Written Assessment of VBMC's pharmacy operation submitted by Cardinal Health to Valley Baptist on or about July 23, 2003:

> Cardinal Healathwill [sic] employ proven utilization protocols and enhanced pharmacy production to drive pharmaceutical costs 4% below the current trend line of 10% This reduction will increase exponentially in years 2–5."

(Doc. No. 121 at 21).  Defendants allege that VBMC never realized any portion of this "promised reduction in costs," and that the rate of cost increases actually escalated under Cardinal Health's management.  (Doc. No. 168 at 32).

The Court finds that these were material representations, and so the first element of a fraud claim is met.  As with Defendants' first and second claims of fraudulent inducement, the Court declines to decide at this time the second element, whether the representation was false, and moves directly to consideration of the third element.

To the extent that the instant claim, like the preceding ones, rests on a promise of future performance, it is actionable only "if the promise was made with no intention of performing at the time it was made." *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992).  Thus, the third element asks: was the promise made with no intention at that time of performing as represented?  The Court must therefore determine whether Defendants have offered summary-judgment evidence sufficient to show that when Cardinal Health represented to Defendant VMBC that it would employ various protocols and production techniques to drive costs 4% below the

current trend line, and that these reductions would increase exponentially, Cardinal Health made this promise with no intention at that time of performing as represented.

Defendants offer the same set of arguments and evidence to show intent with respect to the instant representation as in the case of the representation discussed in their second allegation of fraudulent inducement. Thus, Defendants again contend that (1) Cardinal Health had no intention of performing as represented "because of its deceptive billing practices" and its "systematic pattern and practice of overcharging health care institutions" (Doc. No. 168 at 33, 33–34); (2) "the nature and extent of these overcharges are such that they can only be intentional, and not accidental or random errors" (*id.* at 34); (3) Cardinal Health's refusal to provide the necessary books, documents, and records to certify its cost charges, and its discouragement of requests for such information, indicate that it never had any intention of reducing costs (*id.*); and (4) Cardinal Health never intended to perform because its internal policy was to obtain a 20% profit margin on its contracts, and "[s]uch a high profit margin would not permit the kinds of reductions in costs that Cardinal Health promised" (*id.*).

These arguments fail for essentially the same reasons as in the previous discussion, see *supra* at 18–21. Even if it is true that Cardinal Health intentionally and systematically overcharges its clients, fails to provide the necessary records for an audit, and has a policy of obtaining a 20% profit margin on its contracts, none of this is necessarily inconsistent with an intent to employ various protocols and production techniques to drive costs 4% below the current trend line, and to increase these reductions exponentially. Thus, the Court finds that Defendant has failed to provide any circumstantial evidence suggesting that Cardinal Health had no intention of performing as represented when it promised these cost reductions, and so Defendants fail to meet a necessary

23

element of a fraudulent-inducement claim based on this promise. Accordingly, Plaintiff's Motion for Summary Judgment on this claim is GRANTED.

B.    *Fraudulent nondisclosure*[12]

Under Texas law, fraud by nondisclosure is a subcategory of fraud, *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997), however to be actionable, "there must be a duty to disclose." *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 481 (5th Cir. 2000). In addition, fraud by nondisclosure requires proof of all of the elements of fraud by affirmative misrepresentation, with the exception that the misrepresentation element can be proven by the nondisclosure or concealment of a material fact in light of a duty to disclose. *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 567 (5th Cir. 2005). Nonetheless, the articulation of these elements differs somewhat from fraud claims involving affirmative representations. *See Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001). These elements are: (1) a party conceals or fails to disclose a material fact within the knowledge of the party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to take some action by concealing or failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Id.*

Defendants allege that Cardinal Health failed to disclose to the Hospitals the following "material facts":

1.    That Cardinal Health would purchase cheaper generic drugs and then bill for their more expensive brand-name counterparts;

---

[12]Defendants characterize this claim as an additional instance of fraudulent inducement, however, because the elements of a fraudulent nondisclosure claim differ somewhat from claims involving affirmative representations, the Court will treat it separately from the other inducement claims.

2.    That Cardinal Health would overcharge on the quantity and/or dosage of drugs billed for;

3.    That Cardinal Health would overcharge on the price of drugs;

4.    That Cardinal Health would charge for drugs it never dispensed;

5.    That Cardinal Health would charge for drugs it never purchased;

6.    That Cardinal Health entities systematically, routinely, and knowingly overcharge and falsely charge their partner hospitals;

7.    That Cardinal Health entities systematically, routinely, and knowingly withold from their partner hospitals critical information and records needed to properly assess and verify Cardinal Health's charges, thereby preventing their partner hospitals from discovering the truth and extent of Cardinal Health's overcharges and false, baseless charges, and from timely and effectively disputing Cardinal Health's overcharges and false, baseless charges.

(Doc. No. 121 at 22).

To succeed in avoiding summary judgment on these claims, Defendants must first show that under Texas law, a duty to disclose these "facts" existed between Cardinal Health and the Valley Baptist hospitals. Such a duty would exist had there been a confidential or fiduciary relationship between the parties. *See Coburn Supply Co., Inc. v. Kohler Co.*, 342 F.3d 372, 378 (5th Cir. 2003). This Court has already ruled as a matter of law that Cardinal Health did not owe a general fiduciary duty to Valley Baptist and that no such confidential relationship existed between the parties. (*See* Doc. No. 144).

There is some uncertainty, however, as to whether a duty to disclose exists in Texas absent a confidential or fiduciary relationship. *See United Teacher Assocs. Ins. Co.*, 414 F.3d at 563–66. Although the Supreme Court of Texas in *Bradford v. Vento* explicitly refused to endorse the existence of a general duty to disclose in the context of an arm's-length business transaction, as here, a number of intermediate Texas courts have nonetheless invoked a duty to disclose in contexts other than a fiduciary relationship. Indeed, the Fifth Circuit has held similarly, although in its most recent discussion of the matter, the court noted:

> A reasonable jurist might well conclude, certainly after *Bradford*, that a duty to disclose exists in Texas only in the context of a confidential or fiduciary relationship. This court has so held in *Coburn*, the only Fifth Circuit case that discusses the relevant portion of *Bradford*. However, apart from *Coburn*, it would be fair to say that courts after *Bradford* (including this court) have not gotten the message, but have instead continued to find that a duty to disclose can exist in Texas absent a confidential or fiduciary relationship.

*United Teacher Assocs. Ins. Co.*, 414 F.3d at 566. The Court did not decide the issue because it disposed of the nondisclosure claims by other means.

This Court finds that a duty to disclose exists in Texas only in the context of a confidential or fiduciary relationship. The Court also finds, however, that even if in Texas such a duty extends to an arm's-length transaction such as this one, Defendants fail to meet their summary-judgment burden on the requirement that the party concealed or failed to disclose "a material fact within the knowledge of the party." To meet this element, each and every one of the omissions Defendants list must have been a practice, explicit or *de facto*, of which Cardinal Health could have had knowledge when it withheld this information, e.g., Cardinal Health must have had a practice of purchasing cheaper generic drugs and then billing for their more expensive brand-name counterparts in order for it to have known, as a material fact, that it would eventually do so when billing the Valley Baptist

hospitals. Only then can there have been a material fact that Cardinal Health failed to disclose. The

only evidence Defendants offer suggesting that these omissions concerned actual past practices of

Cardinal Health is the following from the Declaration of Betty Ganey:

> In the past few years, I have had occasion to audit or review Cardinal Health
> records for approximately 15 other institutions. On my audit or review of many of
> these other institutions' dealings with Cardinal Health, I have found that Cardinal
> Health has systematically failed to provide sufficient supporting data to properly
> assess the charges it made to many of these institutions.
>                                    ***
> In my work with other institutions that had used Cardinal Health to provide
> pharmacy management services, I have seen a systematic pattern and practice of
> overcharging on the part of Cardinal Health, including charging for a greater quantity
> than the amount actually dispensed by Cardinal Health. In particular, in my work
> with Community Medical Center in Missoula, Montana, and with Bon Secours St.
> Joseph Hospital in Port Charlotte, Florida, which work with both institutions
> continues on the audit of Cardinal Health invoices, the fraudulent overcharges in each
> case total at this time into at least the hundreds of thousands of dollars if not greater.
> As evidence of Cardinal Health's systematic improper billing practices, while
> I was working with Community Medical Center in Missoula, Montana, I was told
> by a corporate compliance officer of Cardinal Health that Cardinal Health's practice
> is to dispense and charge multiple times from a "single-use" only drug vial. . . . This
> improper practice . . . would partially explain how Cardinal Health could charge
> VBMC for dispensing more drugs than Cardinal Health actually purchased.

(Declaration of Betty Ganey, at ¶¶ 3, 16–17). This evidence fails for several reasons. First,

regarding the alleged systematic withholding of necessary documents, this is merely Ms. Ganey's

opinion. It indicates nothing about whether Cardinal Health understood itself to have had a policy

of withholding necessary documents, which would be necessary for Cardinal Health to have had

knowledge of such a practice and to have failed to disclose it to Valley Baptist. Further, regarding

the alleged systematic practice of improper billing, Ms. Ganey cites only two specific examples,

from Missoula and Port Charlotte, and moreover fails to identify when these audits took place, which

leaves open the possibility that the allegedly improper practices at these other hospitals began after

27

the negotiations between Cardinal Health and Valley Baptist, and so after the time the alleged failure to disclose such a practice would have occurred.  For these reasons, the Court finds that even if in Texas a duty to disclose extends to arm's-length transactions, Defendants still fail to raise a fact issue that Cardinal Health concealed or failed to disclose a material fact within its knowledge, and so fails to meet a necessary element of a fraudulent-nondisclosure claim.  Accordingly, Plaintiff's Motion for Summary Judgment on this claim is GRANTED.

C.    *Fraudulent misrepresentation*

Under Texas law, fraudulent misrepresentation is a species of simple fraud, and so consists of the same elements.  Again, these are: (1) a material representation (2) that was false, and (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of its truth as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.  *See Lane v. Halliburten*, 529 F.3d 548, 564 (5th Cir. 2008).

Defendants allege that "in each and every invoice that [Cardinal Health] submitted to [Defendants] during the entirety of the respective relationships . . . [Cardinal Health] falsely represented the pharmacy fee amount, the 340 B Dispensing Fee amount, the Inventory Settlement amount, as well as the total invoice amount, that was actually owed." (Doc. No. 21 at 25).  At the time Cardinal Health submitted "each and every one of these invoices," Defendants contend, Cardinal Health knew that it was

> (1) purchasing and dispensing generic drugs and charging for their brand-name counterparts; (2) overcharging for the quantity and/or dosage of drugs billed for; and (3) overcharging on the price of drugs; (4) upon information and belief, charging for drugs it never dispensed; and (5) upon information and belief, charging for drugs it never purchased.

(Doc. No. 21 at 26).

Each month, Cardinal Health provided the Valley Baptist hospitals with an estimated invoice, and, according to Cardinal Health, "[a]t the end of a service period, Cardinal Health sent a final invoice to reflect the actual charges and credits due during that time period." (Doc. No. 165 at 40). To the extent that these invoices constituted Cardinal Health's manner of billing Defendants, the Court finds that the invoices are material representations.

Defendants allege that "in each and every invoice that [Cardinal Health] submitted to [Defendants] during the entirety of the respective relationships . . . [Cardinal Health] falsely represented the pharmacy fee amount, the 340 B Dispensing Fee amount, the Inventory Settlement amount, as well as the total invoice amount, that was actually owed." (Doc. No. 21 at 25). In support of this contention, Defendants cite the Declarations of their experts, Betty Ganey and Lee Hayes. Based on her review of the invoices sent to VBMC, Ms. Ganey concludes that "each and every one of Cardinal Health's invoices contained misrepresented amounts that VBMC actually owed in one or more of the following categories: the pharmacy fee amount, Departmental charges, the 340 Dispensing Fee amount, the Inventory Settlement amount, and the total invoice amount." (Declaration of Betty Ganey, at ¶14). Based on his review of the invoices sent to VMBC–Brownsville, Mr. Hayes concludes that "each and every invoice that Cardinal Health submitted to VBMC–B[rownsville] misrepresented the amounts due by VBMC–B[rownsville]." (Declaration of James "Lee " Hayes, at ¶5). To support their claims, Defendants also include in their summary-judgment evidence the full expert reports, which detail specific alleged misrepresentations on specific invoices, e.g., overcharges and charges for drugs never dispensed. (*See* Expert Witness Report of Betty Ganey and Expert Witness Report of Lee Hayes).

Cardinal Health contends that Ms. Ganey's Expert Report and Declaration should not be accepted as evidence of fraud because Ms. Ganey, for various reasons, is not qualified to proffer an expert opinion. (*See* Doc. No. 165 at 38–39). This objection is not appropriate at this stage and should instead be offered in the context of a *Daubert* motion, which as of this Order, Plaintiff has yet to file.

The Court finds that this evidence is sufficient at the summary-judgment stage to show that representations on the invoices submitted to Defendants were false.

Defendants allege that Cardinal Health knew these represented amounts were false or made them recklessly because the drug detail information from which it calculated the amounts it represented in the invoices reflect various types of deliberate and improper charges. (Doc. No. 168 at 24). According to the Declaration of Ms. Ganey, these include purchasing and dispensing cheaper generic drugs and charging for the more expensive brand name counterpart, charging for a greater quantity of drugs than Cardinal Health had actually dispensed, stating higher prices for drugs than the actual purchase price, and charging for drugs that Valley Baptist had received free of charge. (Declaration of Betty Ganey, at ¶14). The Court finds that this evidence creates a circumstantial case sufficient for summary judgment suggesting that Cardinal Health knew when it submitted these invoices that they contained false representations.

The Court also finds that, for purposes of summary judgment, Cardinal Health made these representations with the intent that Defendants should act upon them, and that Defendants acted in reliance on these representations.[13]

---

[13]It could be argued that Cardinal Health never intended for Defendants to act upon representations contained in the "estimated" invoices, since these invoices reflected estimated costs for the upcoming month based on prior use and would according to the contracts be superseded by the "actual" invoices, which would reflect "any applicable credits

Finally, Defendants allege that, based on the records currently available to them, the overcharges to VBMC were at least $5,864,039.52 (Declaration of Betty Ganey, at ¶¶14–15), and the overcharges to VBMC–Brownsville were at least $990,481.28 (Declaration of James "Lee" Hayes, at ¶¶5–6).  Cardinal Health contends that Defendants cannot meet the "caused injury" element of their fraud claims because (1) "Valley Baptist owes Cardinal Health more than Valley Baptist claims it was overcharged"; and (2) "Valley Baptist has passed through all of the drug charges contained on the allegedly-fraudulent invoices to their patients and payors." (Doc. No. 165 at 45).

The crux of the first argument seems to be that because Valley Baptist has refused to pay over $14 million allegedly owed to Cardinal Health, a figure greater than the sum of the overcharges alleged by Defendants' experts, Defendants cannot show that the allegedly fraudulent invoices caused them any actual injury: "To the extent that Defendants have a claim at all, it is a claim of offset, which they have already pled." (Doc. No. 137 at 12).

Offset is an affirmative defense. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 494 n.36 (5th Cir. 2001). "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 19 (1995). Defendants have pleaded offset in this case, as an affirmative defense to their refusal to pay Cardinal Health on various invoices. (Doc. No. 121 at 10).  Plaintiff cites no authority suggesting that offset can be used to

---

or debits arising from the reconciliation of prior month's actual invoice to the estimated invoice." (Pharmacy Agreements Article III section 3.02(a)(ii)).  For the purposes of this Order, the Court finds that Defendants have produced summary-judgment evidence sufficient to show that Cardinal Health intended for Defendants to act upon, and that Defendants acted in reliance upon, any alleged misrepresentations contained in the "actual" invoices, as well as in any estimated invoice that materially affected the calculation of an actual invoice.

defeat the injury element of a fraud claim, and the Court has found none. Accordingly, the Court is unpersuaded by this argument.

In support of its second argument, Plaintiff cites deposition testimony by Valley Baptist corporate officer James Eastham that, in general, "the drugs that Cardinal provided through its pharmacy agreement administered to the patients get charged to the payor." (Doc. 165 at 45–46). Plaintiff cites a number of other similar statements by Mr. Eastham, however none indicate with any specificity exactly how much has been billed to the payor or how much has actually been paid. The Court finds that this evidence more properly goes to determining the amount, if any, of damages, and is best left to the trier of fact.

For these reasons, the Court finds that Defendants' evidence is sufficient for purposes of summary judgment to show that the alleged misrepresentations caused Defendants injury.

### Economic Loss Rule (or the Independent Injury Doctrine)

Plaintiff contends that even if Defendants can show that Cardinal Health overcharged Valley Baptist for the drugs and pharmacy services it provided, Defendants' damages should be limited to the economic damages recoverable on its breach of contract claim. (Doc. No. 165 at 40). Put another way, Plaintiff argues that Defendants fraud claims should be dismissed because "the economic loss rule precludes these claims as a matter of law." (*Id.* at 12). "Simply stated, under the economic loss rule, a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim." *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 796 (Tex.App.–Houston [1st Dist.] 2007, pet. denied). The Supreme Court of Texas explains this doctrine further:

> If the defendant's conduct–such as negligently burning down a house–would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct–such as failing to publish an advertisement–would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss. When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract.

*Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.* 960 S.W.2d 41, 45 (Tex. 1998). Since Defendants (the cross-plaintiffs in our case, because we are considering Defendants' counterclaims) assert the same damages for their fraud claims as for their contract claims, Plaintiff contends, the economic loss rule precludes the fraud claims, including the claim concerning fraudulent invoices.

Defendants, on the other hand, cite Texas case law for the proposition that "despite any duty based on the existence of a contract," a party has an independent duty not to commit the intentional tort of fraud. (Doc. No. 168 at 11–12). Plaintiff contends that this case law is inapplicable to claims like Defendants'. (Doc. No. 165 at 40–42).

The case most useful for resolution of this dispute is *Eastman Chemical Company v. Niro, Inc.*, F. Supp.2d 712 (S.D. Tex. 2000). In this case, a food preservative producer brought a breach of contract claim and a variety of fraud claims against a manufacturer of spray fluidizer dryer. Defendant Niro was to design, build, and install a dryer that conformed to Plaintiff's product output specifications. A purchase order contract was confirmed, and Niro installed the dryer at one of Plaintiff's plants. Plaintiff alleged that from the beginning, the dryer failed to conform to the production capability requirements specified in the contract. Niro visited Plaintiff's facility in an effort to get the dryer to operate at the desired output rate, and allegedly represented to Niro that if

33

various modifications were made to the dryer, it would perform at the desired rate. Plaintiff made these modifications, yet the dryer allegedly never performed as promised. Plaintiff then filed suit, alleging fraudulent inducement and fraud after the formation of the contract, based on the representations Niro made concerning the modifications to the dryer. *Id.* at 714. Defendant invoked the economic loss doctrine to urge dismissal of the claim for fraud after the formation of the contract. *Id.* at 716 n.2.

After expressing its preference for the phrase "independent injury doctrine" over "economic loss rule" to describe the doctrine in question, the court reviewed the case law developing the doctrine and concluded: "The independent injury doctrine will preclude a tort cause of action if 1) the claim is for breach of duty created *solely* by contract rather than a duty imposed by law, and 2) the injury is only the economic loss to the subject of the contract." *Id.* at 717. Applying the first prong of this standard to the facts before it, the court held that "Niro had an independent legal duty not to commit the *intentional* tort of fraud. This duty was not created solely by the contract, but was instead a duty imposed by the common law of Texas." *Id.* Thus, the Court concluded, the first prong of the independent injury doctrine was not satisfied. *Id.*

This rationale applies to the facts of the instant case, as well. Here, the Pharmacy Agreements do not create a duty to refrain from knowingly misrepresenting in the invoices charges owed by the hospitals. This duty is imposed by the common law of Texas. If Defendants based their fraud claim on, for example, an alleged failure by Cardinal Health to submit the invoices on time or to "ensure that its employees and contractors adhere to all applicable written rules and regulations established by the Health Care Facility" (Pharmacy Agreements Article I section 1.03(b)), then this claim would meet the first prong of the independent injury doctrine because these duties are imposed

on Cardinal Health solely by the Pharmacy Agreements. The duty to refrain from knowingly misrepresenting information in the manner alleged by Defendants is a duty imposed by common law, independent of the duties the Agreements create. It makes no difference that the duty to submit invoices in the first place is created solely by the contract. Once this duty is created by the contract, then both parties have a duty under the common law to refrain from executing that duty fraudulently.

Plaintiff attempts to distinguish *Eastman Chemical* from the present case by noting that the representations at issue in that case were made subsequent to contract formation and *concerned modifications not contemplated by the contract*. (Doc. No. 165 at 40 (citing language from *Eastman Chemical Co.*, F. Supp.2d at 718)). Thus, Plaintiff concludes, *Eastman Chemical* involved a fraudulent misrepresentation that was independent of the contract, unlike the instant case, in which Cardinal Health's compensation and invoicing amounts to Valley Baptist were expressly and solely controlled by the contract. (*Id.*).

This argument is not without merit and deeply concerns the Court. Nevertheless, the argument ignores that the *Eastman Chemical* court's rationale does not hinge on whether or not the representations concerned matters outside the purview of the contract. Either way, parties to a contract have an independent legal duty not to commit the intentional tort of fraud. A party is not protected from tort liability simply because its tort was perpetrated in a context of performing an obligation created by contract.[14]

---

[14]Despite this conclusion, the Court nonetheless agrees with the *Eastman* court when it notes that "given the convoluted evolution of the doctrine, it is no easy task to determine the precise contours of the limitations imposed by the independent injury doctrine under Texas law." *Eastman Chemical Co.*, F. Supp.2d at 719. To this extent, the Court "would be receptive to whatever further illumination counsel might be able to shed on this issue" at trial, especially given the fact that the actual damages for the alleged fraud would be the same as the actual damages for the alleged breach of contract. *Id.*

For these reasons, and based solely on the record before it, the Court holds that Defendants' fraudulent misrepresentation claim is not barred by the economic loss (independent injury) doctrine. Since the Court also finds that Defendants have met their summary-judgment burden on all the elements, the Court DENIES Plaintiff's Motion for Summary Judgment on this claim.

## II.    RICO Claim

Defendants also bring an action under 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act, which provides that it "is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." (*See* Doc. No. 121 at 31). All RICO claims have three common elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (internal citation omitted).

A "person" under RICO is defined as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). "Racketeering activity" may consist of any and all predicate acts set forth in § 1961(1). Of these various predicate acts, Defendants allege here mail fraud, wire fraud, and interstate transportation of stolen property. *Id.*; (*see* Doc. No. 168 at 40). A "pattern of racketeering activity" may be found to exist where there are at least two acts of racketeering activity. 18 U.S.C. § 1961(5).

Plaintiff Cardinal Health Solutions, Inc. is a subsidiary of Cardinal Health, Inc., a holding company that counts a number of other entities as subsidiaries, including Plaintiff's predecessor-in-

interest Cardinal Health, 109, Inc. (*See* Deposition of John M. Adams, Jr. at 20). Defendants allege that "Cardinal Health, Inc.'s fraudulent scheme involved setting up subsidiary entities to knowingly and intentionally engage in fraudulent conduct in an attempt to shield the parent company from liability." (Doc. No. 121 at 29). Since this Court has rendered summary judgment on Defendants' fraudulent inducement and nondisclosure claims, the only fraudulent acts still available to constitute the predicate acts for a RICO claim are the submission of (allegedly) fraudulent invoices by Plaintiff's predecessor-in-interest, Cardinal Health 109, Inc. Thus, any RICO claim alleged by Defendants is confined to an alleged scheme between Cardinal Health, Inc. and Cardinal Health 109, Inc. to submit fraudulent invoices over mail and wire.

### Enterprise

"The existence of an enterprise is an essential element of a RICO claim." *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438, 440 (5th Cir. 1987). "The RICO enterprise is the vehicle through which the alleged racketeering occurred, and lies at the heart of the RICO offense." *Do v. Pilgrim's Pride Corp.*, 512 F. Supp.2d 764, 767 (E.D. Tex.2007). An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "association-in-fact enterprise" is "an ongoing organization, formal or informal" functioning as a continuous unit. *Atkinson*, 808 F.2d at 439–40 (citation omitted). Finally, the "enterprise must be 'an entity separate and apart from the pattern of activity in which it engages.'" *Id.* at 441 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Defendants allege that "Cardinal Health, Inc., Cardinal Health Solutions, Inc., Cardinal Health 101, Inc., Cardinal Health 109, Inc., Cardinal Health 303, Inc., Cardinal Distribution and their officers, agents and employees (the 'Enterprise'), acted as a group of persons associated together in fact for the common purpose of carrying out [their] fraudulent scheme . . . ." (Doc. No. 121 at 31). Despite this allegation, however, Defendants provide no actual evidence that Cardinal Health 109, Inc., the entity that submitted the invoices to the hospitals, or any other Cardinal entity, was in fact associated with any of the other entities in this enterprise "for the common purpose of carrying out" a scheme of submitting fraudulent invoices.

This kind of failure was decisive in a controlling case with certain important facts similar to the instant case. In *Atkinson v. Anadarko Bank & Trust Co.*, Plaintiffs brought a RICO claim under § 1962(c) alleging that Defendant Anadarko Bank and Trust Company mailed Plaintiffs false and fraudulent statements charging a rate of interest on loans made to Plaintiffs in excess of what the parties had agreed to. 808 F.2d at 439. After the jury rendered a verdict in favor of Plaintiffs on this claim, the district court found that Plaintiffs had not established that Anadarko Bank, its holding company, Anadarko Bankshares, Inc., and three bank employees constituted an enterprise separate and distinct from the bank itself. *Id.* at 440.

On appeal to the Fifth Circuit, Plaintiffs contended that Anadarko Bank, its holding company, and the three employees were an enterprise separate and distinct from Anadarko Bank because "the defendant bank, the holding company, and the three employees conspired to defraud plaintiffs through the use of the mails by charging a rate of interest in excess of the agreed rate." *Id.* The Circuit Court upheld the district court's finding, concluding:

The record here contains no evidence that the bank, its holding company, and the three employees were associated in any manner apart from the activities of the bank. Plaintiffs wholly failed to establish the existence of any entity separate and apart from the bank. In this case, the alleged racketeering activity forming the predicate of the RICO charge was mail fraud–the mailing of false statements requesting payment of interest in excess of the agreed amount. The mailing of loan statements was an activity of the bank. There is no evidence of any other activity on the part of the alleged enterprise.

In addition, there was no evidence presented that the five associates functioned as a continuing unit or formed an ongoing association. No connection was shown between the three individuals and the holding company. The only fact implicating the holding company in the alleged association was its purchase of shares of plaintiffs' notes from the bank. Reasonable jurors could not have found the existence of an enterprise separate and apart from the bank.

(*Id.* at 441).

This analysis applies to the instant case, as well. Valley Baptist has provided no evidence that Cardinal Health, Inc., "principally a holding company that owns stock of its subsidiaries who are involved in various aspects of the healthcare industry," formed an ongoing association with Cardinal Health, 109, Inc. for the purposes of mailing the allegedly fraudulent invoices. (Doc. No. 168 (quoting Deposition of John M. Adams, Jr. at 20). The closest Defendants come to providing evidence of such an association is to make the conclusory assertion that because many of the same individuals serve as officers of various Cardinal Health entities, including Cardinal Health 109, Inc., this "demonstrate[s] that a function of these subsidiaries is to facilitate or conceal the fraud of Cardinal Health, Inc. since the same individuals who control Cardinal Health, Inc. have also controlled Cardinal Health, 109, Inc. and other Cardinal entities. This is also evidence that Cardinal Health, Inc. conducted or participated in the conduct of the enterprise's affairs." (Doc. No. 168 at 49).

39

The factual similarities between this case and *Atkinson* are striking. In both cases, RICO violations are alleged based on the mailing of false statements (or invoices) requesting payment in excess of an agreed amount. In both cases, the mailing of the statements or invoices is an activity of the subsidiary of a holding company, and in both cases there is no evidence presented that the holding company and its subsidiary "functioned as a continuing unit or formed an ongoing association" for the purposes of committing the predicate acts.

Defendants have had over a year of discovery in which to uncover evidence that officers of Cardinal Health, Inc. (or any other Cardinal entity for that matter) associated with Cardinal Health 109, Inc. for the purpose of mailing fraudulent invoices to the Valley Baptist hospitals. Despite months of discovery, Defendants have provided nothing more than the bald assertion that since some of the same individuals serve as officers of both Cardinal Health, Inc. and Cardinal Health 109, Inc., Cardinal Health, Inc. must be participating in the submission of the allegedly fraudulent invoices. This is insufficient. Reasonable jurors could not find the existence of an association-in-fact enterprise separate and apart from the activities of Cardinal Health, 109, Inc., and so Defendants fail to meet an essential element of their RICO claim. Accordingly, Plaintiff's Motion for Summary Judgment on the RICO claim is GRANTED.

## III.   Defendants' Objections

Defendants have filed a set of Objections to Plaintiff's Reply in Support of its Original and Supplemental Motion to Dismiss and/or Motion for Summary Judgment (Doc. No. 165), contending that Plaintiff asserts in this brief additional grounds and evidence for summary judgment in violation of the Federal Rules of Civil Procedure, as well as this Court's own Civil Procedures. (Doc. No.

177).  Specifically, Defendants allege that presentation of these additional grounds and additional evidence violates Rules 7(b)(1) and 56 of the Federal Rules of Civil Procedure and § 6(c) of this Court's "Civil Procedures."

Rule 7(b)(1) provides that a party must "file the disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court."  Defendants do not specify which portion of Rule 56 is relevant to their objection.  Section 6(c) of this Court's "Civil Procedures" provides that a Reply brief is to be limited to the "new arguments, authority or evidence presented by the opposing party in the response."

Defendants offer four specific instances in violation of these Rules:

1.      Plaintiff for the first time attempts to assert a ground that Valley Baptist suffered no injury because it billed its patients for Cardinal Health's overcharges.

2.      Plaintiff asserts for the first time that Cardinal Health's representations as to amounts Valley Baptist would receive and the reductions in cost increases that Cardinal Health represented that Valley Baptist would obtain are not actionable because these are mere future opinions and predictions.

3.      Plaintiff for the first time attempts to assert grounds for summary judgment on Valley Baptist's nondisclosure theories.

4.      Plaintiff filed evidence with its Reply brief that is not purely responsive to the evidence or briefing filed by Valley Baptist.

As the Court has rejected Plaintiff's argument contained in the first objection, the Court DENIES that objection as moot.  As the Court has not considered Plaintiff's argument concerning

the actionability in tort of future opinions and predictions, the Court DENIES Defendants' second objection as moot. As the Court has considered neither the grounds mentioned in the third objection, nor the evidence mentioned in the fourth objection, these objections are DENIED as moot, as well.

Finally, the Court points out that it has bent over backwards to allow Defendants time to develop their new tort theories. To this extent, it would be unfair for the Court not to give similar leeway to Plaintiff.

In light of the preceding discussion, Plaintiff's Supplemental Motion to Dismiss and/or Motion for Summary Judgment (Doc. No. 137) is hereby **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court **GRANTS** Plaintiff summary judgment on Defendants' fraudulent-inducement and fraudulent-nondisclosure claims, and **GRANTS** Plaintiff summary judgment on Defendants' RICO claims in their entirety. The Court **DENIES** Plaintiff summary judgment on Defendants' claim of fraudulent misrepresentation related to invoices issued during the life of the contracts. Finally, Defendants' Objections to Plaintiff's Reply in Support of Original and

Supplemental Motion to Dismiss and/or Motion for Summary Judgment (Doc. No. 177) are **DENIED** as moot.

Signed this 21st day of January, 2009.

Andrew S. Hanen
United States District Judge